United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

DIMARIO PICKFORD,

Petitioner,

vs.

GERALD JANDA, Warden,

Respondent.
_______________________________/

No. 13-2686 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. Petitioner responded with a traverse and a request for an evidentiary hearing. For the reasons set out below, the request and the petition are denied.

**BACKGROUND**

On September 10, 2010, a jury convicted petitioner of first degree murder and possession of an assault weapon. Answer, Ex. 1, at 352, 355. The jury also found true an allegation that petitioner personally used a firearm to commit murder. Answer, Ex. 1, at 352. Petitioner was sentenced to a term of fifty years and eight months to life in prison. Answer, Ex. 1, at 361. On March 28, 2012, the California Court of Appeal affirmed the judgment. Resp's Answer, Ex. 11. A petition for review was summarily denied by the California Supreme Court on June 13, 2012. Answer, Ex. 13. A petition for writ of habeas corpus was summarily denied by the California Court of Appeal on December 13, 2012. Answer, Ex. 17. A petition for writ of habeas corpus was summarily denied by the

United States District Court
For the Northern District of California

California Supreme Court on May 1, 2013. Answer, Ex. 19.

The facts, as described by the California Court of Appeal, are as follows:

**A. *The Shooting of Desmond Thomas***

On October 18, 2008, at approximately two minutes after midnight, Oakland police officers were called to the scene of a shooting on Seminary Avenue just north of Hayes Street in East Oakland. "ShotSpotter" sensors in the area recorded seven gunshots fired within less than three seconds and transmitted a signal calling police to the scene. When officers arrived five minutes later, they found Desmond Thomas on the ground with multiple gunshot wounds to the chest. He was accompanied by a woman who was screaming and attempting to apply pressure to the wounds. Thomas was conscious and talking, but said he did not know who shot him. The woman told police that she had been driving with Thomas when they decided to stop at a store to buy some snacks and, seconds after Thomas exited the passenger side of the vehicle, she heard gunshots and ducked down. Thomas called to her that he had been shot but she did not see the shooter.

While Oakland police officer Delbert White was gathering evidence at the scene, a woman named Tameca Jessie approached him and said she had information, but did not want to talk in public. She asked White to meet her at her house down the block. White walked to Jessie's house which was approximately 100 yards away and spoke to her while he stood on her porch and she stood inside behind her door. It did not appear to the officer that Jessie was under the influence of any substance, but she was clearly nervous. Jessie reported that "the word on the street" was that Thomas had been in an argument with some of his friends, but she was unable to recall any names at that time. Officer White gave Jessie a phone number to call if she had anything to add.

**B. *The Investigation***

Thomas was taken to the hospital but died as a result of his injuries. The homicide investigation was assigned to two Oakland police officers, Sergeant Caesar Basa and Sergeant Robert Nolan. Within a few days of the shooting the officers identified appellant as their primary suspect based on separate reports by two of his acquaintances, Tameca Jessie and Darell Richardson.

**1. *Tameca Jessie***

On the morning of the shooting, Detective Basa arrived at the crime scene at approximately 3:25 a.m. Shortly thereafter, a woman approached and talked to him about her vehicle which was parked within the taped crime scene area. The woman, who said her name was Tameca, asked Basa for a phone number so she could contact him later and he gave her the office number. Basa returned to his office and, at approximately 3:49 a.m., he received a call from Tameca Jessie. Basa recognized Jessie's voice as the women [sic] who spoke to him at the crime scene and decided to record the call. At trial, the jury was provided with a transcript of the telephone conversation and the recording of the phone call was played in court.

At the beginning of the phone conversation, Basa obtained identification and contact information and asked how Jessie was doing. She said that she was okay but nervous. She said that she needed to keep her voice low because people were around her. When Basa asked what Jessie had seen, she said that she had pulled up in her car and stopped in front of the store on Seminary when she heard the girl

United States District Court
For the Northern District of California

screaming and saw the ambulance. Then Jessie made this comment: "But what I do know, he got into it with somebody named Mario." Jessie said that Mario is also called "Rio," and as she spoke she had to tell herself to calm down.[1]

Jessie told Basa that she knew the victim, whose name was Desmond, because she had babysat for his young son. She also knew Rio because he was a friend of her teenage son, although he was older than her son. Jessie provided a physical description of Rio and of his car and said she would try to find out where he was living. Then she said "I think he really did it. He did it. He did. It." Jessie apologized for whispering but said that people were around and she did not want to be overheard. Basa asked about the 'beef' between Rio and Desmond and Jessie said they had been fighting over a girl, not the girl who had been in the car with Desmond that night but another girl, who had become pregnant and that Desmond had been "messing around with her," but Rio was in love with her. Basa asked Jessie for details of what she saw earlier that night and finally asked whether Jessie had seen anybody shoot. At first Jessie laughed at the question but when Basa pressed her for an answer, Jessie admitted that she saw Rio shoot at Desmond five or six times.

After questioning Jessie about the details of what she saw that night, Basa asked about Rio. Jessie said that she had known him for over three years, that he was a grown man, but that he spent time with her 15–year–old son and that they would come to her house and she would cook for them. When Basa asked whether she had seen Mario with a gun before, Jessie laughed and said yes, she had seen him with a .45 and with a "chopper."[2] She said that Mario had brought a gun to her house a few weeks earlier and she had told him not to do that because she did not want it around her son who was already on probation for something he did not "even do." Near the end of the conversation, Basa said that his partner Detective Nolan might call to follow up.

On October 23, 2008, Detective Nolan contacted Jessie by phone and arranged for her to come to the police station for an interview. Jessie said she was concerned about her family's safety and that she was especially frightened for her son. So, after Nolan finished his phone conversation with Jessie, he contacted the victim witness office and arranged for Jessie to receive some money so that she and her family could be relocated to another town. Later that afternoon, Jessie arrived at the station, and the detectives took her into an interview room where they activated video equipment so that the interview would be recorded. The videotape of the interview was not admitted into evidence at trial, but significant portions of the transcript of that interview were read out-loud to the jury and transcribed into the trial record.[3]

---

[1] At trial, Jessie admitted that she had been "a little intoxicated" during her telephone conversation with Basa, but she also recalled that she was "focused" during that phone call.

[2] Thomas was killed by .45 millimeter bullets.

[3] This fact has caused some confusion for appellate counsel and led to disagreements about what evidence was and was not presented to the jury. Our factual summary of the October 23 interview is based on portions of the interview transcript that were read at trial as well as the trial testimony of the detectives who conducted the interview.

During the first part of the October 23 interview, Jessie said she was unable to identify who shot Desmond Thomas. This revelation led to the following exchange between Nolan and Jessie:

"Q. 'So you know Mario did this but you didn't see his face?'

"A. 'I didn't see his face, but he came – remember I told you I spoke to him last night when I tried to see what was going on with my son, and that's what made me say my son needs to go because he told me, he said it's not good for your son. That's what he told me and I talked to him last night.'

"Q. 'What did he say?'

"A. "He told me—I asked him—let me start. He seen me yesterday, the day before that he pulls up in a tan, a champagne-looking Buick with three other guys. He's on the passenger side. So my son was standing outside, I'm standing outside. My sister. And I just seen like the way he looked. He called my son to the car, so I went to see my son yelling so I walked over there because all the guys, they looking and I'm thinking, you know, they about to do my son something.

"He said, um yeah, yeah. The police came to your house huh. The police came to your house. You telling now? Are you telling?

"So Mario is yelling at my son. My son's yelling. So I grabbed my son. So what I did, I had my son to call or because I want to know what's going on.

"Because he pulled out a gun on us that day and said I'm always strapped.' "

In light of the fact that Jessie had changed her story and was now claiming she did not see the shooter, the detectives took a break in the interview, and then escorted Jessie into another room where they had her listen to the recorded telephone conversation during which she told Basa that she saw Mario shoot Thomas. While listening to the recording, Jessie became subdued and looked defeated. She started to cry and asked the officers to turn off the recording. She told them she was afraid to be a witness and that her main concern was her son's safety. Sergeant Nolan told Jessie that he was going to arrange for her son to be relocated and that he would give her $200 to make that happen. He also said that he would help make arrangements to relocate Jessie and her daughter.

The group returned to the interview room, where the recording devices were still activated. Jessie apologized to the detectives for lying during the first part of the interview and said that she was just scared because she had an encounter with Mario the previous night. She said that she had gotten in the car to talk to him and that he had threatened her, that he said that he knew the police had come to her house, and he claimed other people were saying that her son had told the police that he was the shooter. Jessie said that Mario advised her that it would be best for her and her son to leave town, and that he turned the light on in his car and he was holding the same gun that he had with him when he came to her house weeks earlier and told her that he was "always strapped."

As the October 23 interview continued, the questioning returned to the details of the October 18 shooting incident. Jessie acknowledged that she had witnessed the shooting. She told the detectives that appellant was the shooter and she also

United States District Court
For the Northern District of California

selected appellant's photograph from a photo lineup.

**2. *Darell Richardson***

Meanwhile, on October 19, 2008, Darell Richardson was arrested for auto theft. Upon learning that Richardson hung out in the Seminary area of East Oakland, the arresting officer asked if he knew anything about the shooting of Desmond Thomas. Richardson had already heard, from talk on the street, about the shooting, and he told the officer that he had some information.[4] Richardson subsequently participated in a police interview which was recorded. Although the recording was not admitted into evidence at trial, Richardson subsequently testified about what he disclosed to police in October 2008.

Richardson and appellant were friends from childhood and, for approximately 10 years, they hung out in a group together in the area of Seminary and Hayes. Richardson was aware that there was "bad blood" between appellant and Desmond Thomas because appellant used to talk to him about their problems. At the time of trial, Richardson could not recall "the whole reason why" appellant disliked Thomas, but he testified that they had petty problems and they may have fought over a dice game or something.

A few days before Thomas was shot, Richardson hung out with appellant and a group of friends outside the store on Hayes and Seminary, where the group often hung out together. Thomas happened to drive by and appellant told Richardson that he would have started shooting at Thomas if the group had not been with him. Appellant was armed when he made this statement and he pulled out his gun, which was a .40 or .45 caliber pistol, and showed it to Richardson. He said that the reason he did not shoot at Thomas was because he did not want to accidentally hit one of the friends who was in front of the store.

A few days after Thomas was shot, after Richardson had already heard about the shooting, appellant called Richardson and admitted that he had shot and killed Thomas.

**3. *Appellant's Arrest and Trial***

On October 28, 2008, Detective Nolan obtained a warrant to arrest appellant. Before the warrant was served, Nolan ensured that Jessie's family was safe. He then requested that officers from the Targeted Enforcement Task Force try to locate and arrest appellant. The task force set up a surveillance in the Seminary area where appellant hung out.

On October 30, appellant was spotted and observed coming and going from a residence on Seminary near where the shooting had occurred. Undercover officers followed him when he left the residence and drove away in a red Infinity. They subsequently performed a traffic stop and placed appellant under arrest. Appellant was not armed but he was wearing a bulletproof vest. From the residence where appellant had been spending his time, police recovered a backpack which contained papers with appellant's name on them and a 9 millimeter assault weapon.

---

[4] Richardson offered information hoping it would keep him out of jail and subsequently testified at trial that somebody promised him he would not be charged with the auto theft if he provided information about the murder.

> Appellant was charged with first degree premeditated murder and possession of an assault weapon. At the jury trial, which commenced on August 23, 2010, the prosecution presented substantial evidence of the facts summarized above. Both Tameca Jessie and Darell Richardson failed to appear in response to subpoenas but were apprehended and testified at trial while in custody. Jessie testified that she got a good look at the shooter and that there was no doubt in her mind that appellant shot Thomas. Richardson testified about his friendship with appellant, the encounter they had when Thomas drove by the store a few days before the murder, and the phone call during which appellant admitted that he shot Thomas.

Resp's Answer, Ex. 11, at 1-8 (renumbered footnotes in original).

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must

United States District Court
For the Northern District of California

be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state-court decision is objectively unreasonable. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). This review is not a "de novo review of the constitutional issue"; rather, it is the only way a federal court can determine whether a state-court decision is objectively unreasonable when the state court is silent. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

## DISCUSSION

As grounds for federal habeas relief, petitioner asserts that: (1) the prosecution violated his right to due process by failing to disclose a complete transcript of a witness's police station conversation with her daughter; (2) the prosecution violated his right to due process by failing to disclose prior convictions of, and a pending charge against, a witness; and (3) trial counsel's failure to investigate the above-mentioned claims deprived petitioner of his right to effective assistance of counsel. These claims were summarily denied by both the California Court of Appeal and California Supreme Court on petitions for writ of habeas corpus.

### I. Suppression of Evidence

Petitioner claims that the prosecution violated its obligation under *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963), by failing to disclose impeachment evidence when the prosecution failed to provide a complete transcript of witness Tameca Jessie's police

station conversation with her daughter. Pet. at 6. Petitioner also argues that the prosecution failed to disclose prior convictions of, and a pending charge against, Jessie. Pet. at 8.

**Legal Standard**

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. There are three components to a *Brady* violation. *See Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002). First, the suppressed evidence must be favorable to the accused. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Brady*, 373 U.S. at 87). Second, the evidence must have been suppressed by the government, either willfully or inadvertently. *See United States v. Agurs*, 427 U.S. 97, 110 (1976). Third, the suppressed evidence must be material to the guilt or innocence of the defendant. *See Bagley*, 473 U.S. at 676-78. Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial. *Id.* at 676. Evidence is not material for *Brady* purposes if it is inadmissible under state law. *See Smith v. Baldwin*, 510 F.3d 1127, 1148 (9th Cir. 2007) (en banc).

*Brady* has no good faith or inadvertence defense; whether nondisclosure was negligent or by design, it is the responsibility of the prosecutor. *See Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004). Moreover, the rule includes evidence "'known only to police investigators and not to the prosecutor.'" *See Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (quoting *Kyles v. Whitley,* 514 U.S. 419, 438 (1995)). In order to comply with *Brady,* therefore, "'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in [the] case, including the police.'" *Id.* (quoting *Kyles*, 514 U.S. at 437).

A defendant cannot claim a *Brady* violation if he was "aware of the essential facts enabling him to take advantage of any exculpatory evidence." *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (citation omitted); *see, e.g.*, *Rhoades v. Henry*, 638 F.3d

1027, 1038-39 (9th Cir. 2011) (no disclosure violation where one of three reports pertaining to the same confession was turned over and the reports not turned over added no details not apparent or available from the other sources).

Impeachment evidence is exculpatory evidence within the meaning of *Brady*. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). "*Brady* information includes 'material . . . that bears on the credibility of a significant witness in the case.'" *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1461 (9th Cir. 1993) (quoting *United States v. Strifler*, 851 F.2d 1197, 1201 (9th Cir. 1988). "Evidence relevant to the impeachment of a witness adverse to the defendant may be favorable and material when the reliability of the witness may be determinative of the defendant's guilt or innocence." *United States v. Collins*, 551 F.3d 914, 924 (9th Cir. 2009) (internal quotation marks and citation omitted).

**A. Transcript of Police Station Conversation**

While conducting a recorded interview with Jessie, police officers took a break from speaking with her. During the break, a conversation occurred between Jessie and her daughter that was recorded but difficult to understand. Petitioner's trial counsel possessed a recording and transcript of the interview with police and the conversation with the daughter. Petitioner claims that the prosecution violated *Brady* by providing a transcript of the conversation that listed some of the conversation as unintelligible rather than ascertaining what the parties discussed with an enhanced recording.

This claim fails because petitioner was aware of the "essential facts" enabling him to take advantage of the evidence. As respondent notes, habeas counsel[5] developed her enhanced recording of the conversation from a copy of the DVD of Jessie's police station interview that she received from trial counsel's files. Pet., Ex. B, Decl. of Marylou Hillberg at 4. Moreover, trial counsel impeached Jessie by reading back her prior inconsistent statements from a copy of the transcript of the police station interview and the conversation

---

[5] Properly speaking, Ms. Hillberg is not petitioner's habeas counsel because petitioner is representing himself pro se. Nevertheless, since it is apparent that she is assisting petitioner as though she represented him, for purposes of this opinion she will be referred to as habeas counsel.

with her daughter. RT 162-170. There is thus no doubt that trial counsel was in possession of both the recording and the transcript and that he must have been aware that there were portions of the transcript that had been deemed unintelligible by the police. Therefore, petitioner "had within [his] knowledge the information by which [he] could have ascertained the supposed *Brady* material." *See United States v. Dupuy*, 760 F.2d 1492, 1502, n.5 (9th Cir. 1985). Likewise, petitioner asserts that the portions of the recording that the police claimed were undecipherable "are now clearly audible by means of simple, widely available technology that increases the volume of the voices and decreases the volume of background noise." Request for an Evidentiary Hearing at 3. Hence, not only did petitioner have information sufficient for him to take advantage of the supposed *Brady* evidence, the means of enhancing the recording were readily available to him as well.

Moreover, petitioner's assertion that the previously undeciphered portions of the recording are now fully understood is open to interpertation. Habeas counsel states that the Audio Forensic Center of San Francisco greatly increased the audibility of the recording, but the technician had difficulties understanding Jessie due to her thick southern, African-American accent. Pet., Ex. B, Decl. of Marylou Hillberg at 4. A copy of the transcript with additional handwritten notes stating the previously undeciphered portions of the conversation was provided with the petition. Pet., Ex. A. This version was provided with the help of petitioner's mother, who could understand Jessie's accent, and a woman named Vernette Suggs, whose affiliation with the case is not clear. Pet., Ex. B, Decl. of Marylou Hillberg at 4; Pet., Ex. A at 14. The resulting transcript is the "best estimates" of the spoken words. Pet., Ex. A at 14.

Assuming the updated transcript is accurate, there are very few additions that trial counsel did not possess in the original transcript.[6] There are no new facts known that were not already presented to the jury or were material to petitioner's guilt or innocence, and

---

[6] The transcript of the interview that trial counsel possessed is part of the Clerk's Transcript at 501 to 551. The enhanced version of the transcript found in Exhibit A of the Petition corresponds with the pages 513 to 520 of the original transcript.

Jessie was thoroughly impeached at trial based on the recordings associated with this claim and other issues. Evidence was presented that she had a 2007 misdemeanor conviction for embezzlement, RT 137:23-26; that she had been inconsistent in her statements to the police, RT 162-175; that she had received money for plane tickets to Louisiana from the homicide detectives, RT 119:14-20; that she had received $1,200 worth of assistance total from the District Attorney after testifying at the preliminary hearing, RT 127:12-15; that she had been intoxicated when she spoke to Sergeant Basa on the phone, RT 145:3-9; that she had driven to the store at the scene of the shooting even though she was not supposed to be driving because she did not have a valid driver's license, RT 135:19-136:2; and that she had been on her way to purchase alcohol at the time of the shooting even though she was not supposed to be drinking alcohol. RT 135:19-25. The original transcripts already noted that it was dark during the incident, and other names were mentioned. Clerk's Transcript at 513, 515.

As petitioner was aware of the "essential facts" necessary for him to take advantage of the evidence, as the evidence was not material, and as the witness was throughly cross-examined, the state courts' rejection of this claim was not objectively unreasonable and the claim is denied.

**B. Prior Convictions**

**i. Child Desertion**

Petitioner next claims that the prosecution violated *Brady* by failing to disclose Jessie's prior misdemeanor conviction for child desertion.[7] This claim fails because the conviction could not have been admitted to impeach Jessie, because under California law a conviction can only be used to impeach a witness if it involves a crime of moral turpitude. *People v. Castro*, 38 Cal. 3d 301, 317 (1985). Moral turpitude means a "general readiness to do evil." *People v. Forster*, 29 Cal. App. 4th 1746, 1756 (1994).

[7] It appears the prosecution disclosed part of the witness's criminal history in Louisiana, but the prosecution was unaware of other crimes because the witness used different dates of birth for those cases. Pet., Ex. B, Decl. of Marylou Hillberg at 8-10.

United States District Court
For the Northern District of California

In *People v. Sanders*, the court held that a conviction for child endangerment is not a crime of moral turpitude for impeachment purposes. 10 Cal. App. 4th 1268, 1270 (1992). In that case, the defendant had been impeached with evidence of a prior felony conviction for child endangerment under Cal. Penal Code § 273a(a). *Id.* The statute read:

> Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one year, or in the state prison for 2, 4, or 6 years.

*Id.* at 1273.

The court concluded that a conviction under § 273a(a) "does not necessarily imply a general readiness to do evil or any moral depravity" and thus impeachment of the defendant was improper. *Id.* at 1275.

Here, Jessie was charged and convicted in Louisiana under La. Rev. Stat. § 14:93.2.1(A) in that "[she], having care, custody or control of a child under the age of 10 years, did desert or abandon such child, knowing or having reason to believe that the child could be exposed to a hazard or danger against which the child could not reasonably be expected to protect himself." Pet., Ex. E-2. When compared with the similar child endangerment statute at issue in *Sanders*, it is clear that a violation of Louisiana's child desertion statute does not necessarily involve a crime of moral turpitude.

Accordingly, Jessie's misdemeanor conviction for child desertion would not have been admissible at trial, and, regardless, petitioner has not demonstrated that the conviction was material to impeach her credibility in light of the other impeachment evidence. The state courts' rejection of this claim was not objectively unreasonable, and this claim is denied.

**ii. DUI Conviction**

Petitioner's claim that the prosecution violated *Brady* by failing to disclose Jessie's 2004 DUI conviction fails for exactly the same reason that his *Brady* claim based on Jessie's child desertion conviction fails: evidence of the conviction is inadmissible because

the crime does not necessarily involve moral turpitude, and petitioner cannot show that the lack of this impeachment evidence undermines confidence in the jury's verdict.

At the time of petitioner's trial, petitioner was informed that Jessie had one DUI conviction in California, but there was a second California DUI conviction.[8] While it is not clear if these convictions were misdemeanors or felonies, it is apparent that the elements of California's DUI statutory provisions do not necessarily involve moral turpitude. A defendant was not found to have committed a crime involving moral turpitude until the third DUI conviction in a seven-year span. *See People v. Forster*, 29 Cal. App. 4th 1746, 1752, 1754-58 (1994); *see also In re Carr*, 46 Cal. 3d 1089, 1091 (1988) (misdemeanor DUI does not involve moral turpitude). As the witness did not have three or more DUI convictions at the time of trial, the undisclosed second DUI conviction would not have been admissible at trial and the state courts' rejection of this claim was not objectively unreasonable.

**iii. Criminal Damage to Property**

Petitioner also argues that the prosecution violated *Brady* by failing to disclose a criminal damage to property charge against Jessie pending in Louisiana. This claim fails because there is no evidence that the charge involved moral turpitude or that the pending charge was material under *Brady*. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *U.S. v. Bagley*, 473 U.S. 667, 682 (1985).

As discussed above, Jessie was impeached at trial with evidence that she had a conviction for embezzlement, that she had been inconsistent in her statements to the police, that she had received money for plane tickets to Louisiana from the homicide detectives, that she had received $1,200 worth of assistance total from the District Attorney's Office after testifying at the preliminary hearing, that she had been intoxicated when she spoke to Sergeant Basa on the phone, that she had driven to the store at the

---

[8] After trial Jessie received a third DUI conviction in a Louisiana court, which referenced the prior two California convictions. Pet., Ex. E-4.

scene of the shooting even though she was not supposed to be driving because she did not have a valid driver's license, and that she had been on her way to purchase alcohol at the time of the shooting even though she was not supposed to be drinking alcohol.

Given the volume of impeachment evidence offered against Jessie at trial, there is no reasonable probability that evidence of the pending charge against Jessie for criminal damage to property in Louisiana would have convinced the jury not to convict petitioner of first degree murder. Where the undisclosed impeachment evidence would have provided no independent basis for impeaching the witness separate from evidence already known to and utilized by the defense, no *Brady* violation will be found. *United States v. Kohring*, 637 F.3d 895, 908 (9th Cir. 2011); *see Schad v. Ryan*, 671 F.3d 708, 715 (9th Cir. 2011) (per curiam) (finding no *Brady* violation where prosecutor failed to disclose letters requesting leniency for prosecution witness from judge presiding over witness's criminal trial because letters would merely have duplicated grounds for impeaching witness that were actually presented to the jury, and there was strong circumstantial evidence of petitioner's guilt). Accordingly, evidence of Jessie's criminal damage to property charge was not material, and the state courts' rejection of this claim was not objectively unreasonable.

**II. Ineffective Assistance of Counsel**

Petitioner claims that trial counsel's failure to investigate the above-mentioned claims deprived him of his right to effective assistance of counsel.

**Legal Standard**

In order to succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires a showing of deficient performance and prejudice. Deficient performance requires a showing that trial counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003). To establish prejudice, a petitioner must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694.

**Discussion**

The court has already determined that evidence of Jessie's other convictions and charges was not material under *Brady*. Therefore, petitioner's claim of ineffective assistance of counsel fails with respect to trial counsel's failure to discover Jessie's other convictions and charges because petitioner cannot show prejudice.

Even assuming that trial counsel was deficient in failing to enhance the recording of the witness conversation, petitioner fails to demonstrate a reasonable probability that but for trial counsel's failure the outcome of the trial would have been different. Petitioner essentially argues that an enhanced recording or transcript would have enabled trial counsel to impeach Jessie more effectively, but, as already discussed above, the record shows that Jessie was rigorously impeached in any event and there was no material in the enhanced recording that greatly differed from what trial counsel already possessed. Moreover, as set forth above, trial counsel exploited the numerous and massive discrepancies among Jessie's various accounts of the shooting to undermine her credibility. RT 146-156, 162-175.

The jury already had ample cause to discredit some or even all of Jessie's testimony, and thus it is difficult to see how any further impeachment evidence could have affected their decision to convict petitioner of first degree murder. *See U.S. v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984) (holding that counsel's failure to present cumulative evidence does not constitute ineffective assistance of counsel). Accordingly, trial counsel's failure to enhance the recording was not prejudicial, and the state courts' rejection of petitioner's ineffective assistance of counsel claim was not objectively unreasonable.[9]

[9] Petitioner has also requested an evidentiary hearing regarding the recorded statements from the witness. As these claims have been denied and even if the enhanced audio from the recordings was accurately transcribed, the statements were not *Brady* material. Therefore, no evidentiary hearing is necessary, and the appointment of counsel is not required.

United States District Court
For the Northern District of California

**III. Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard. Here, the court finds that petitioner's first two claims regarding the *Brady* material meet the above standard and accordingly GRANTS the COA solely for those claims. *See generally Miller-El*, 537 U.S. at 327.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals. *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997). Petitioner is cautioned that the court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

**CONCLUSION**

1. For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

2. Petitioner's motion for an evidentiary hearing and to appoint counsel (Docket No. 9) is **DENIED**.

A Certificate of Appealability is **GRANTED**. *See* Rule11(a) of the Rules Governing Section 2254 Cases.

The clerk shall close the file.

United States District Court
For the Northern District of California

**IT IS SO ORDERED.**

Dated: July 21, 2014.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.13\Pickford2686.hc.wpd